# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 04-11294PBS

|  |  |
|---|---|
| The HipSaver Company, Inc., | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| J.T Posey Company, | ) |
| Defendant | ) |
|  | ) |

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION
# FOR A PRELIMINARY INJUNCTION

Lee Carl Bromberg
BBO no. 058480
Edward J. Dailey
BBO no. 112220
BROMBERG SUNSTEIN, LLP
125 Summer Street - 11th floor
Boston, Massachusetts 02110-1618
617.443.9292
617.443.0004 (fax)
Dated: June 16, 2004

Attorneys for The HipSaver Company, Inc.

## TABLE OF CONTENTS

Page

### INTRODUCTION

Statement of Facts                                                           2

    The Parties                                          3

    The Fraudulent Product Safety Test                   4

    Expert Evaluation of the Product Safety Test         6

    The False and Fraudulent Advertising Campaign        9

    Expert Evaluation of the Advertising Campaign        11

    Harm to HipSaver                                     14

### ARGUMENT

I.    HipSaver Is Likely To Prevail On Its Claims Of
False Advertising, Fraud, and Deception                                      15

    A.    The Advertising is Literally False and
Violates the Lanham Act                                                      15

    B.    The Advertising is Unfair Competition
and Deceptive and Fraudulent under G.L. c.93A                                16

II.    HipSaver Is Entitled to a Preliminary Injunction   18

III.    The Trial Court Should Order Comprehensive
Injunctive Relief                                                           19

### CONCLUSION

## INTRODUCTION

The HipSaver Company ("HipSaver") has moved for a preliminary injunction seeking corrective measures and an immediate halt to an intentional, fraudulent, bad faith campaign of literally false advertising and unfair competition. The Defendant, J.T. Posey Company is the dominant, nationwide distributor of patient safety and support equipment and devices. Its fraudulent advertising targets HipSaver, a small competitor with a limited but inventive product line. Posey's strategy is to so disparage and discredit HipSaver's product safety that it will shortly be driven from business. Posey's actions violate the Lanham Act, 15 U.S.C. §§1125, 1117, and the Massachusetts Business Practices Act, G.L. c.93A, §§2, 11.

Posey's false advertising is grounded in an entirely unreliable, fundamentally flawed, and fraudulently presented comparative product safety test conducted by a graduate student at the University of California Los Angeles ("UCLA"). Posey has intentionally misrepresented the test protocol and results as if they are the work of UCLA. More important, Posey has fraudulently misrepresented the products which were tested and distorted the results. Posey claims the "UCLA" test found HipSaver products to be inferior and less capable of preventing hip injury to older patients than Posey's competing product. In fact, *HipSaver products were not even tested*; and Posey's widely published claims that its products are more effective than HipSaver products are literally false, deceptive, and the product of fraudulent misrepresentation. A collected listing of Posey's false advertising claims are set out at Tab C. Specific advertisements are attached as exhibits.

**Statement of Facts**

The Parties

HipSaver is a small, closely held company incorporated in the Commonwealth and operating from offices in Canton, Massachusetts. HipSaver has been in business since 1995. *See* Affidavit of Edward Goodwin, founder and president at Tab A. HipSaver's primary business is to invent, develop, manufacture, and sell soft hip protectors which reduce the potential for critical hip fractures in elder patients who suffer some 300,000 hip fractures annually in the United States. HipSaver's Soft hip protectors were invented by Mr. Goodwin.

The soft hip protectors incorporate an open cell foam pad enclosed in an expandable air holding pouch as shown in Exhibit 1. Together, the pad and pouch have a substantial capacity to absorb and disperse energy associated with a fall and provide fracture protection to the femur. The device is washable and is sewn into clothing and positioned geometrically to cover the femur in the event of a fall or other impact.

HipSaver protectors incorporate Mr. Goodwin's inventive technology for air-holding protective foam pad construction, including US Patent No. 6,519,789B2 and for a washable protective pad, including US patent pending pub. no. US2004/0078873A1, before the United States Patent and Trademark Office. HipSaver protectors are marketed under the HIPSAVER® trademark.

The Defendant, Posey, is a long established company and dominant supplier of hundreds of patient safety and support products. Posey operates from home offices in Arcadia, California. Posey routinely copies the work of other companies and then uses its market dominance to introduce "knock-off" products to the market.

3

Posey operates nationwide through catalogs, internet sales (www.posey.com), and a national network of representatives and distributors. Posey markets to 17,000 nursing homes and 3,000 rehabilitation hospitals. In Massachusetts, Posey markets to more than 100 health care facilities. HipSaver markets to the same facilities in Massachusetts and nationally.

In late 1998 or early 1999, three years after HipSaver introduced its soft hip protectors, Posey introduced a hip protector product under the mark, HIPSTER. [Exhibit 2] This product was a soft, removable hip protector but was poorly designed and not well received in the marketplace.

Beginning in early 2001, Posey secretively purchased samples of HIPSAVER hip protectors from the Plaintiff. [Exhibit 3] Posey then copied much of the design of the HIPSAVER protector and introduced a knockoff marketed initially as the HIPSTER III. [Exhibit 4]. Posey's product is now marketed simply as HIPSTER. It competes directly against HipSaver products.

The Fraudulent Product Safety Test

Posey's HIPSTER knock-off copies HipSaver's design. In an effort to sell "on the cheap", however, Posey's designed The HIPSTER with a surface area which is about 30% smaller than HipSaver, thus substantially reducing both the hip area which is protected and the dispersion of energy associated with a fall. *See* Exhibit 1.

Apparently, Posey has recognized that its knock-off is vulnerable to safety and quality concerns. So, it has embarked on a campaign to disparage and discredit HipSaver by challenging the safety of HipSaver protectors. Early in 2003, Posey retained a graduate engineering student at UCLA, Bimal Ghandi, to conduct comparative tests of

hip protectors and then to collaborate on a "White Paper" which Posey uses in its advertising campaign against HipSaver. [Exhibit 6] Posey also cites the "White Paper" as justification for false advertising in its catalogs.

Mr. Ghandi was studying for a Master of Science degree in biomedical engineering. He was not and is not an expert in the field of biomedical or biomechanical engineering, and his test work at issue here was not subjected to expert peer review. He states that he was engaged by Posey to conduct tests of the "energy absorbing characteristics of various industry produced hip protectors". [Exhibit 5]

Posey and Mr. Ghandi claim to have tested five "hip protectors". In fact, the test protocol did _not_ include tests of hip protectors. As later acknowledged by Mr. Ghandi and his faculty advisor, the hip protectors were stripped and reduced to core materials only. Expandable air holding pouches, a critical energy dispersing component in the HipSaver invention, were discarded and excluded from the tests. [Goodwin Affidavit at Tab A] This material fact was secreted by Mr. Ghandi and Posey and is not disclosed in Posey's advertising.

Posey and Mr. Ghandi intentionally misrepresented, distorted, and biased the tests to exclude critical energy dispersing components because Posey's HIPSTER is a smaller product which cannot absorb and disperse fracture producing energy at the level of HipSaver. By excluding a critical energy dispersing component of a competing product, Posey and Mr. Ghandi were able to distort test results and misrepresent the relative safety of competing products, particularly HipSaver.

Posey and Mr. Ghandi intentionally misrepresented, distorted, and biased reported and advertised test results by excluding the results of one competing hip protector which,

even in a rigged test, outperformed Posey's HIPSTER.  While the results are set out in Mr. Ghandi's thesis, he misrepresents the results in his "White Paper", and, of course, Posey makes the same false reports in its catalog advertising.

Posey and Mr. Ghandi falsely claim also to have included two HIPSAVER protectors among the five tested "hip protectors", one identified as HIPSAVER and another identified as "SLIMSAVER".  HipSaver does not have a product under the name, "SLIMSAVER".  The test protocol and Mr. Ghandi's faculty adviser have identified the so-called HIPSAVER protectors by color, "blue"; by substance, "rubber base"; and cross sectional dimension, "9mm".  In fact, HIPSAVER protectors are pink/orange in color, do not include a rubber base but incorporate homogeneous foam, and have a cross sectional dimension of 12.7 mm.  Exhibit 1 and Goodwin Affidavit at Tab A]  In short, the threshold claim that HipSaver products were tested is itself false.

Expert Evaluation of the Product Safety Test

Notwithstanding the fact that Posey and Mr. Ghandi have misrepresented what was tested (the stripped core materials rather than hip protectors) and then failed even to test HipSaver products, the underlying test protocol and results are fatally flawed.  Mr. Ghandi's thesis which is the source description of his work has been reviewed by Wilson C. Hayes, Ph.D., a biomechanical engineering expert retained by HipSaver.  Dr. Hayes, who is recognized and cited in Mr. Ghandi's thesis as an authoritative source, received a Ph.D. in biomedical engineering, served for ten years as the Maurice E. Mueller Professor of Biomechanics at the Harvard Medical School, and presently serves on the faculties of Oregon State University and Oregon Health & Science University.

6

Dr. Hayes has more than 30 years experience as a teacher, researcher, and consultant in a range of fields, including mechanical engineering, experimental mechanics, injury biomechanics, human functional anatomy, and clinical orthopedics. He has served as principal or co-principal investigator on 61 research projects involving biomechanics, he has authored or co-authored more than 190 peer reviewed publications, some 60 chapters, and three books. Dr. Hayes and colleagues have produced validated mathematical models for the dynamics of human falls and associated injuries and have developed, tested, patented, and published novel hip protectors for the prevention of fractures. He founded and edited the Journal of Orthopedic Research, the most widely cited research journal in orthopedics. *See* Hayes Report and *vita* at Tab B.

Beyond his extensive experience in biomechanics and his 30 year study of biomechanical injury, Dr. Hayes and his colleagues at the Beth Israel-Deaconess Medical Center developed the definitive model of the hip fracture process and a mathematical index or "factor of risk" to describe the ratio of impact forces applied to the hip in a fall and the hip's residual strength. This model permits evaluation of various hip padding or hip protector systems. [Hayes Report at Tab B]

Dr. Hayes was asked to make his evaluation on the basis of his background, education, and training and to express his opinions to a reasonable degree of engineering and medical certainty. After reviewing and evaluating Mr. Ghandi's test protocol, Dr. Hayes concludes, in part:

1) "Unfortunately and significantly, however, there is a fundamental and I believe fatal flaw in Mr. Ghandi's experimental methods. This flaw is sufficiently serious to render his tests not only unreliable and inaccurate but completely unrepresentative of a fall on the hip." [Hayes at 5] The root of the problem is that

Mr. Ghandi chose to concentrate the impact forces through an impact hammer of a highly limited cross-sectional area (about 3 inches in diameter; see Fig.3.4 on page 40 of Ghandi's thesis). …. [T]he profound consequences of this difference in methodology can be immediately appreciated by noting that people fall and break their hip by landing on large, flat surfaces such as the floor and not by falling and landing on a 3-inch diameter cylinder, projecting upward from the floor. To make matter worse, Mr. Ghandi (presumably with the agreement of his advisor) has chosen to represent the force attenuating properties of the surrounding soft tissues of the hip (often referred to in the literature as "shunting") in a completely inadequate way. …. Put more simply, the test performed by Mr. Ghandi would not distinguish between a large diameter pad [such as HipSaver] and a much smaller diameter pad [the Posey Hipster], despite the obvious improvement in force attenuation that would be provided by the larger pad." [Hayes at 5]

2) Mr. Ghandi failed to use current databases of femoral fracture tests in calculating his so-called "fracture threshold". [Hayes at 6]

3) "When performing experimental tests for any purpose, it is crucial that not only should the testing methodologies be accurate and reliable, but that the test specimens, subjects, or products be properly identified and maintained in a condition that is clearly described. This appears not to have been the case with the Ghandi tests …. In addition, for testing commercial products, it is crucial that such products be maintained in the form that is equivalent to that which is manufactured, sold, and potentially used by the buying public. In this instance, Ghandi does not provide a clear and complete description of the test materials. …. Moreover, there appears to be evidence in this case that the tested devices may have been altered prior to testing (for instance, by removing the plastic encapsulation surrounding an open-celled, porous foam). If true, this would represent a major deviation from accepted scientific practices and raise additional and serious concerns about both the motivation and integrity of the test results." [Hayes at 6,7]

4) "Since the behavior of an air-filled, open-celled, porous foams in fact depend on the difference between the internal pressure of the air in the foam and the external pressure at its boundaries, eliminating the plastic encapsulation and thereby

changing the pressures at the boundaries of the foam … can be expected to severely distort the behavior of the encapsulated foam. …. In fact, tests conducted without encapsulation in place could be expected to markedly under perform (in terms of force attenuation characteristics) the commercially available product." [Hayes at 7]

Concluding his review of Mr. Ghandi's work, Dr. Hayes raises a concern that goes far beyond fundamental flaws in the methodology and execution and questions the very legitimacy of Mr. Ghandi's undertaking: "In my view, there is no legitimate basis for having excluded any products that were tested. Having done so is in my view a clear reflection of an attempt to distort the record and provide competitive advantage to the Posey system. **This unjustified elimination of key results, especially given that they support false claims is equivalent to scientific fraud …."** [Hayes at 7] (emphasis supplied)

<u>The False and Fraudulent Advertising Campaign</u>

Posey's advertising is distributed to more than 17,000 customers. Mr. Ghandi's flawed and fraudulent work is the basis for his "White Paper" [Exhibit 6] which Posey distributes broadly to customers and which is used also to justify Posey's false catalog advertising claims. The "White Paper" suggests that it is a summary of Mr. Ghandi's testing "conducted at UCLA". In fact, it contains deceptions, fraudulent misrepresentations, and literally false test comparisons. *See* collected listing of false statements at Tab C. Indeed, even the reference to UCLA is a misleading suggestion that UCLA stands behind or otherwise legitimizes this deception. In fact, UCLA does not stand behind Mr. Ghandi's work.

The "White Paper" first makes the literally false statement that "hip protectors" were tested when, in fact, only stripped core materials were tested. The "White Paper", which is aimed at HipSaver as Posey's only significant competition, next makes the

literally false statement that HipSaver protectors were tested when, in fact, none was tested.

The "White Paper" also makes the literally false statement that four "hip protectors" were tested when, in fact, the core materials from five hip protectors were tested. [Exhibit 6 at 9]  As noted in Dr. Hayes' report, Posey and Mr. Ghandi excluded the test results from the core material of the fifth protector because it performed, even in a rigged test, at a higher level than the Posey HIPSTER core material. [Exhibit 7, excerpt from Mr. Ghandi's thesis at 48]  Then, the "White Paper" makes the literally false statement that "the Posey Hipsters have shown superiority when tested *in vitro* compared to those of other competitors". [Exhibit 6 at 9]  Finally, the "White Paper" makes the literally false statement that "Posey hipsters ... outperformed all competitive hip protectors tested". [Exhibit 6 at 9]

Posey uses the literally false representations, statements, and comparisons from the "White Paper" to justify fraudulent, deceptive, and literally false comparative charts and statements in its 2004 product catalogs.  [Exhibit 8]  The catalogs state that Posey's HIPSTER "outperformed all hip protectors tested at UCLA".  And the catalogs include a completely false bar chart purporting to demonstrate the relative safety performance of HIPSTER and competing products, including two identified as HipSaver products. Posey's catalogs go on to proclaim in large bold letters, " POSEY HIPSTERS PROVEN MOST EFFECTIVE IN IN-VITRO TESTING".  Finally, the catalogs proclaim falsely, " In in-vitro laboratory testing performed at UCLA, Posey Hipsters were shown effective in reducing the force of impact in simulated falls to 36% below the average fracture

threshold of the proximal femur, and Posey Hipsters outperformed all other energy-absorbing foam hip protectors tested."

<u>Expert Evaluation of the Advertising Campaign</u>

Each of the advertising claims set out here is based on a fatally flawed and fraudulently manipulated test.  And as Dr. Hayes has concluded, the claims are invalid, the product of scientific fraud, and literally false.

---

"Based on my review of the case materials and on my background, education, training and experience in injury biomechanics generally and the testing of trochanteric padding systems specifically, I conclude, to a reasonable degree of engineering and medical certainty, that:

a. "The testing conducted in the Ghandi thesis does not support the claim in the "White Paper" that Posey Hipsters have been compared to "market competitors".  A valid chain of custody of the tested products has not been established, nor have the products (or parts of the products) been clearly described.  To the extent that any of these "products" have been altered in *any* way (especially if an open-celled, porous foam has been tested without its plastic encapsulation) [it] could not be assumed to be representative of its commercial product. ….  **I therefore conclude that this claim is literally false**";

b. "On the basis of information available to me at this time, **I cannot confirm or reject whether or not commercially available products have been tested** or simply parts of these products";

c. "The "White Paper" does not in fact disclose that one of the "products" has been omitted from the results included in the "White Paper".  Not only has no justification been provided for doing so, but no possible scientific justification is available.  In fact, given that the data for the most effective pad have been eliminated, **I believe that the only inference available is that the test results have been intentionally distorted to show the Posey system in a more favorable light**";

---

d. "In my view, there is no legitimate basis for having excluded any products that were tested. Having done so is in my view a clear reflection of an attempt to distort the record and provide competitive advantage to the Posey system. **This unjustified elimination of key results, especially given that they support false claims is equivalent to scientific fraud**";

e. "As noted above, the testing protocols are fundamentally flawed, given that they focus solely on the material behavior of competing products and do not reflect the advantages of geometric or structural differences such as larger area or the ability to "shunt" impact forces into the soft tissues. This conclusion, especially when taken in combination with the unjustified elimination of certain test results, leads me to conclude that the testing does not support the claim in the "White Paper " that [the] "Posey Hipster outperforms several other hip protectors". **Again, in my view, this claim is literally false**";

g. "Similarly, the testing does not support the claim in the "White Paper" that the "Posey Hipster outperformed all competitive hip protectors tested". **This claim too is literally false**";

h. "The testing also does not support the claim in the catalog "Posey Hipsters proven most effective in in-vitro testing. **Again, this claim is literally false**";

i. Similarly, the testing does not support the claim in the catalog that "Posey Hipsters outperformed all other energy absorbing hip protectors tested". **Again, this claim is literally false**";

j. "Finally, and again, similarly, the testing does not support the claim in the catalog that "In recent tests performed at UCLA, Posey Hipsters were shown effective in reducing the force of impact in simulated falls to 36% below the average fracture threshold of the proximal femur, and Posey Hipsters outperformed all other hip protectors. **Again, the claim is literally false**". (emphasis supplied)

Had Posey and Mr. Ghandi merely conducted a flawed test, their conclusions and advertising would, of course, remain invalid, useless, and literally false. In this case, however, the flawed test, which is at the core of Posey's campaign of deception and

disparagement, was itself manipulated and fraudulently misrepresented from the outset. Posey and Mr. Ghandi claim to have tested hip protectors when both clearly knew that the test evaluated only a component of the hip protectors.  Posey and Mr. Ghandi intentionally excluded tests of the entire device to distort comparative results.  Posey and Mr. Ghandi claimed also to have tested HipSaver products, yet it is clear from Mr. Ghandi's description that something other than (components from) HipSaver was tested. Even more disturbing, Dr. Hayes notes in his report that Posey and Mr. Ghandi distorted test results to such extent that the work as fraudulent.  The fact is that Mr. Ghandi and Posey have used the guise of science and the apparent legitimacy of UCLA to engage in misrepresentation and fraud.  Every comparative statement and claim in the White Paper" and catalog advertising is literally false.

The "White Paper" and some 50,000 copies of Posey's catalogs with these claims have been distributed to customers in nursing and rehabilitation facilities across the United States, including more than 100 customers in Massachusetts.  The "White Paper" and catalogs are distributed also at trade conferences and exhibitions across the country. The catalogs have a shelf life of at least a year and are referred to routinely by health care workers who purchase patient safety and security products.

The "White Paper" is also routinely used in Posey's telemarketing and Internet marketing.  For example in an e-mail message, a Posey telemarketing sales representative refers to the 'White Paper" as having "scientifically validated" the Posey HIPSTER.  "In fact, they are scientifically better than the "HipSaver".  You might want to check out the whitesheet (*sic*) put out by UCLA in August 2003".  *See* e-mail from Brian Anderson, Posey sales representative, Exhibit 9.

Without this court's intervention then, Posey's fraudulent advertising will remain with customers over much of the next year and will, in all likelihood, be repeated in subsequent advertising.

<u>Harm to HipSaver</u>

Posey's literally false misrepresentations, deception, and product disparagement are aimed at HipSaver, intended to undercut the reputation and integrity of Plaintiff's products, and directed to unfairly compete and overwhelm HipSaver in the marketplace – all by fraudulent means. Posey's advertising campaign is particularly damaging because of the lack of knowledge among health care buyers and Posey's marketplace dominance. Hip protection products are new; neither the biomechanics nor the relative performance of competing products has been well understood in the marketplace. [Goodwin Affidavit at Tab A] Lacking a strong understanding of performance and safety, buyers are susceptible to being misled by deceptive advertising masked in pseudo scientific certainty, precisely the strategy pursued by Posey. And with Posey's dominance in the marketplace, its claim to superiority makes it an easy, "safe" choice. The problem, of course, is that the "safe" choice is fraudulent. The problem for HipSaver is that as the victim of fraud, it cannot long withstand Posey.

As noted above, HipSaver is a small, single product company competing against a dominant, multi-line company. Prior to the current false advertising blitz, HipSaver competed with some success and on the basis of a demonstrated record of product safety and durability. Faced now with more than 50,000 copies of "White Paper" and catalog advertising which falsely compares HipSaver's product safety, the Plaintiff faces the short term prospect of being shut out of the marketplace. Indeed, within the past month,

at least one major purchaser, has declined to consider HipSaver further, expressly opting for Posey's HIPSTER.  [Goodwin Affidavit at Tab A]

HipSaver does not have the resources or the presence in the marketplace to counter Posey's fraudulent campaign.  Without the trial court's intervention, Posey will continue to undercut HipSaver.  However, both the Lanham Act and the Massachusetts Business Practices Act provide for the court's intervention to halt and reverse this campaign of unfair competition, deception, and fraud.

**ARGUMENT**

I.     **HipSaver Is Likely To Prevail On Its Claims Of False Advertising, Fraud, and Deception**

    A.     <u>**The Advertising is Literally False and Violates the Lanham Act**</u>

The Lanham Act, 15 U.S.C. §1125(a), prohibits commercial advertising which misrepresents the nature, characteristics, or qualities of another's goods or services. Here, Posey's "white paper" and widely circulated catalog advertising falsely and fraudulently misrepresent the product safety of HipSaver protectors through literally false product comparisons.  On the basis of flawed and fraudulently manipulated testing which is falsely suggested to have the *imprimatur* of the University of California Los Angeles, Posey claims product safety superiority, Posey claims statistically significant superiority relative to HipSaver, Posey claims to have "outperformed all other energy-absorbing foam hip protectors", Posey claims to have "reduced the impact force below all other levels tested", and Posey claims its HIPSTER is "superior in laboratory controlled impact tests".

Posey's advertising claims are characterized as establishment claims because they are said to have been established on the basis of scientific tests.  *Spalding Sports*

15

*Worldwide, Inc. v Wilson sporting Goods Co.,* 198 F.Supp.2d 59, 67 (D. Mass. 2002). As such, the advertising claims are literally false if premised on invalid tests.

> When an advertising claim of favorable fact either expressly or impliedly asserts that the fact is test or study validated, the fact of the validation becomes an integral and critical part of the claim. Such a claim may therefore be proven literally false by showing only that the test asserted to validate it did not in fact do so. *Spalding* at 67

And where an advertising claim is literally false, it violates the Lanham Act without further showing. *Clorox Company Puerto Rico v Proctor & Gamble Commercial Company,* 228 F.3d 24, 33 (1st Cir. 2000).

As set out above and demonstrated by Dr. Hayes in his expert report, every one of Posey's advertising claims in the "White Paper" and catalogs is literally false. The claims are all expressly premised on Mr. Ghandi's flawed, fraudulent, manipulated, and invalid test. The invalidity of the test, the manipulation of results, and the resulting claims are false and violate the Lanham Act.

B. **The Advertising is Unfair Competition and Deceptive and Fraudulent under G.L. c.93A**

While Posey's business is national in scope and its fraudulent advertising campaign is nationwide, the Defendant has targeted a Massachusetts based company which is its primary competition, it has copied and "knocked-off" the products of a Massachusetts based company, it engages in business in the Commonwealth on a sustained basis and directly through a Massachusetts based agent, it has significant sales every year in Massachusetts, and it has, in fact, solicited and published the challenged ads to at least 100 health care customers in Massachusetts. As such, "the center of gravity of circumstances that give rise to the claim is primarily and substantially in the Commonwealth". *Kuwaiti Danish Computer Company v Digital Equipment*

*Corporation,* 438 Mass. 459, 473 (2003). Consequently, HipSaver's parallel claim against Posey for violation of the Massachusetts Business Practices Act, G.L. c. 93A, §§2, 11 is properly before the trial court.

Under c.93A, trade or commerce subject to the Business Practices Act expressly includes commercial advertising. *See* c.93A, §1(b). And under the Act, determinations of unfair or deceptive method of competition are guided by regulatory and judicial interpretations of the Federal Trade Commission Act, 15 U.S.C. §45(a)(1). Thus, to the extent that commercial advertising violates the FTC Act, it also violates c.93A as unfair competition.

The Federal Trade Commission has long prosecuted all manner of *false or misleading* advertising. The Commission has routinely challenged deceptive advertising like Posey's ads which make false comparative claims of product superiority. And federal courts have routinely upheld the Commission's determination that these ads are unfair competition or deceptive to consumers under the FTC Act. *Novartis Corporation v Federal Trade Commission*, 223 F.3d 783, 785, 786 (D.C Cir. 2000); *Federal Trade Commission v Gill*, 71. F.Supp. 2d 1030 (C.D. Calif. 1999). Clearly then, false advertising violates the FTC Act and under section 2 of the Massachusetts Act is unfair competition.

Posey's fraudulent advertising is targeted against its smaller Massachusetts competitor. Posey's advertising, as confirmed by Dr. Hayes' expert analysis, is literally false and, as such, is unfair competition and unfair or deceptive under c.93A. This violation expressly entitles HipSaver to injunctive relief and multiple damages similar to

the Lanham Act but also entitles HipSaver to mandatory attorney fees and costs.  See

c.93A, §11.

## II.    HipSaver Is Entitled to A Preliminary Injunction

The standard test for preliminary injunctive relief requires a showing that the

Plaintiff will suffer irreparable harm, that this harm outweighs any injury to the

Defendant, that the Plaintiff is likely to succeed on the merits of its claims, and that the

public interest will not be adversely affected by granting injunctive relief.  *Camel Hair*

*and Cashmere Institute of America, Inc. v Associated Dry Goods Corporation*, 799 F. 2d

6, 12 (1st Cir. 1986)  As set out above, HipSaver has demonstrated through authoritative,

expert evidence that it is likely to succeed in proving Posey's advertising is unfair,

deceptive, literally false, and fraudulent – all in violation of the Lanham Act and c.93A.

As demonstrated above also, there is no adverse consequence whatsoever to Posey in

enjoining its false advertising.  Posey's dominant position in the marketplace will not be

undercut by termination of its false advertising; hip protectors are but one of hundreds of

products it sells.  And the public interest will be served by halting this deception –

particularly where the false advertising is directed to a health care product.  *Camel Hair*

at 15.  There remains then only the requirement for irreparable harm.

In cases such as this, where challenged advertising is literally false, federal courts

do not require substantial proof of irreparable harm.  First, as noted by the court in *Camel*

*Hair*, the Lanham Act requires only a demonstration that the Plaintiff "is likely to be

damaged" for an injunction to issue.  And that likelihood can be demonstrated by an

inference that damage in the form of lost sales will follow from deceptive advertising

which undercuts Plaintiff's reputation.  799 F.2d at 13.  In fact, as noted above,  HipSaver

has already faced lost sales opportunity from a major customer. [Goodwin Affidavit at Tab A]

Moreover, the *Camel Hair* court has declared that 'the public interest purposes of the Lanham Act … [require] a liberal interpretation of the irreparable injury factor. 799 F.2d at 14. The real damage from false advertising is not lost sales but damage to the Plaintiff's reputation and credibility in the marketplace. Where the Plaintiff is undercut by literally false advertising, even if the likelihood of pecuniary injury is small, the public purpose of the Lanham Act encourages injunctive relief. Protection of the Plaintiff's reputation satisfies the irreparable injury requirement and warrant grant of an injunction against literally false advertising. 799 F.2d at 16.

In sum, HipSaver has met the requirements for preliminary injunctive relief.

## III.    The Trial Court should Order Comprehensive Injunctive Relief

In this case, HipSaver has been targeted by a nationwide campaign of unfair competition through literally false advertising. Posey has distributed at least 50,000 copies of its fraudulent ads, and those ads will remain in the purchasing areas of nursing facilities and rehabilitation hospitals for a year. As a much smaller competitor, HipSaver does not have the resources or the marketing staff to counter Posey. Consequently, the court's injunction must be crafted to counter Posey throughout the next year.

HipSaver seeks injunctive relief as follows:

- A preliminary injunction halting all further publication, distribution, or reference to the "White Paper" or the false testing conducted by Mr. Ghandi;
- A preliminary injunction halting all further publication, distribution, or reference to the alleged superiority of Posey hip protector products on the

basis of Mr. Ghandi's work or on the basis of any other "testing" without prior submission of the testing to the Plaintiff for review;

- A preliminary injunction requiring Posey to publish and pay for distribution of a corrective statement to its entire customer and marketing lists at least quarterly during the next year, the corrective statement to admit that Posey's catalog advertising and "White Paper" are *literally false;* and

- A preliminary injunction requiring Posey to pay for HipSaver's publication of corrective advertising to Posey's entire customer and marketing list.

## CONCLUSION

For the reasons set out here, HipSaver requests the trial court to halt Posey's literally false advertising and to grant the comprehensive injunctive relief requested.

Respectfully submitted,
THE HIPSAVER COMPANY, INC.
By its Attorneys,


  s/  Edward J. Dailey

Lee Carl Bromberg
BBO no. 058480
Edward J. Dailey
BBO no. 112220
BROMBERG SUNSTEIN, LLP
125 Summer Street - 11th floor
Boston, Massachusetts  02110-1618
617.443.9292
617.443.0004  (fax)
Dated:  June 17, 2004

00001/00001  313922.2

### Certificate of Service

I certify that a copy of this document has been forwarded by overnight express to the Defendant at it its business address of record, 5635 Peck Road, Arcadia, California  91006.

  s/ Edward J. Dailey
Edward J. Dailey
June 17, 2004