UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 04-11294-PBS

HIPSAVER COMPANY, INC., )
)
Plaintiff, )
)
v. )
)
J.T. POSEY COMPANY, )
)
Defendant. )

**DECLARATION OF JOHN ROSS FRYMARK**

I, John Ross Frymark, declare:

1. I am Vice-President of Marketing for J.T. Posey Company ("Posey"). I have held this position at Posey since April 2002. I was previously employed by Posey from July 1999 through February 2000 as Vice-President of Sales and Marketing, and I served as a consultant to Posey between October 2001 and April 2002. Between February 2000 and October 2001, I worked for a different company and/or was self-employed. The facts recited in this declaration are within my personal knowledge and if called as a witness I could and would testify thereto.

2. My responsibilities at Posey include, among other things, developing and executing marketing plans and goals, and planning and overseeing advertising and promotional activities.

3. In approximately June 2002, Vicky Lewis, who is a Product Manager for Posey, told me that she had been contacted by Bimal P. Gandhi, a

1

graduate student at UCLA. Ms. Lewis told me that Mr. Gandhi wanted to do a master's thesis in which he would conduct scientific tests of hip protector products to test their force attenuation, and that Mr. Gandhi had asked for assistance from Posey in this endeavor.

4. Mr. Gandhi's idea of testing hip protector products seemed to be a good opportunity to evaluate the effectiveness of hip protectors from various sources. I discussed this idea with Ms. Lewis and with Ernest Posey, who is Posey's chief executive officer.

5. In July or August 2002, I spoke with Dr. Vijay Gupta, the UCLA professor who supervised Mr. Gandhi's project. Dr. Gupta explained that Mr. Gandhi intended to conduct experimental laboratory tests, which required developing special equipment. Dr. Gupta asked for Posey to sponsor the research project through the contribution of funds. Dr. Gupta mentioned three ways that Posey could support the project: (1) Posey could make a grant for a specific purpose; (2) Posey could make an outright gift; or (3) Posey could arrange for a consultancy relationship with Dr. Gupta.

6. On August 9, 2002 there was a meeting at UCLA, attended by myself, Ms. Lewis, Dr. Gupta and Mr. Gandhi. This was the first of two meetings at UCLA that I attended. At that meeting, Dr. Gupta and Mr. Gandhi outlined the basic ideas for the testing, described some of the equipment that would be needed, and estimated some of the costs. Dr. Gupta asked whether Posey would be willing to contribute sufficient funds to cover the costs of the equipment. I stated that Posey would consider it.

7. In September 2002, we decided to contribute funds in the form of an outright gift to UCLA's Engineering Department. We understood that

the purpose of the gift was to allow graduate student research of hip protector devices under the supervision of Dr. Gupta, to establish a test protocol, build a test bed, and test various product devices to determine effectiveness. This outright gift was the only funding Posey ever gave to Dr. Gupta or UCLA. Posey never contributed any other funds of any kind directly or indirectly to Dr. Gupta, Mr. Gandhi or UCLA.

8. The statement made by Mr. Goodwin that Mr. Gandhi had been "retained" by Posey is incorrect. Posey never retained Mr. Gandhi. Posey never paid any money to Mr. Gandhi.

9. Posey did not at any time directly or indirectly participate in the development of the test protocol or any methodology of testing the devices or interpretation of the test results. These matters were entirely in the hands of Dr. Gupta and Mr. Gandhi.

10. At the request of Mr. Gandhi, Ms. Lewis obtained various product samples of hip protectors. The sample products were: (1) Posey Hipster; (2) SafeHip; (3) Fall Guard; (4) HipSaver Nursing Home model and (5) HipSaver SlimFit model. Ms. Lewis mistakenly referred to the HipSaver SlimFit model as a "Slimsaver," and in documents ultimately authored by Mr. Gandhi the correct name of the product referred to as the "Hipsaver Slimsaver" is the HipSaver SlimFit.

11. The second meeting at UCLA took place on February 19, 2003. That meeting was attended by Dr. Gupta, Mr. Gandhi, Ms. Lewis, myself, and Ernest Posey. At that meeting, they told us that the Posey Hipster had outperformed all products that they tested. During this meeting, we learned that Mr. Gandhi had tested the foam pads that are used in the various products. We requested that they also test the pads contained in their pouches. Dr. Gupta stated he did not think it would make any

       difference in the testing whether the pads were tested within the pouches or outside the pouches because he said "the air could not be displaced fast enough to affect the impact time."

12. Despite the fact that Dr. Gupta said he did not think it would make any difference, we requested that they test the pads in their pouches. They agreed that they would do so.

13. At that meeting, we discussed with Dr. Gupta the idea of having a "White Paper" which would summarize the results of Mr. Gandhi's experiments. Dr. Gupta agreed that a White Paper would be provided to Posey.

14. No one at Posey ever told Dr. Gupta or Mr. Gandhi what information to include in or exclude from the White Paper. That was entirely up to Dr. Gupta and Mr. Gandhi. Our only concern was that the White Paper be accurate and that it be reasonably brief so that it could be read and understood by potential customers of Posey.

15. After the February 19, 2003 meeting, Ms. Lewis obtained some additional samples for Mr. Gandhi to test in the pouches. These included four different types of foam that were used or potentially could be used in the Posey products, and additional samples of the HipSaver Nursing Home model and the HipSaver SlimFit model.

16. We received the final version of the White Paper from Mr. Gandhi in October 2003. I have always believed that Mr. Gandhi had accurately summarized the results of his testing in the White Paper. Neither I nor anyone at Posey ever asked Mr. Gandhi to include any specific information in the White Paper or to exclude anything from the White Paper. We never told him what conclusions to reach or how to express his conclusions. We never told him how to establish his test protocol,

4

what type of equipment to use, how to conduct the tests, or how to interpret the test results.

17. The only thing we ever requested was that the foam pads be tested inside their pouches. It was and is my understanding that Mr. Gandhi's conclusions stated in the White Paper included his testing of the pads within the pouches. My understanding was supported by Dr. Gupta's statements that there should be no difference in the comparative results whether the pads were tested in the pouch or out of the pouch.

18. Posey did not ever make any substantive changes to the White Paper. One of the marketing editors at Posey made some editing changes, such as formatting and grammatical changes, changing syntax and the like, which were approved by Mr. Gandhi. Other than those types of changes, Posey had no input whatsoever in the content of the White Paper.

19. I and everyone involved at Posey have always believed that Mr. Gandhi and Dr. Gupta conducted appropriate tests of the hip protectors that were supplied to them, and that the conclusions stated by Mr. Gandhi in the White Paper are accurate and reliable.

20. Since this lawsuit was filed, I have spoken with Dr. Gupta and Mr. Gandhi. Neither Dr. Gupta nor Mr. Gandhi ever said to me that anything in the testing methodology or interpretation of the results as expressed by Mr. Gandhi in his thesis and in the White Paper is in any way inaccurate or unreliable.

21. One question raised by HipSaver was why did the White Paper not mention the results of testing of the SafeHip product. The explanation for that, according to both Dr. Gupta and Mr. Gandhi, is that the SafeHip product has a hard plastic shell, whereas the Posey and

HipSaver products use a soft foam pad. Consequently, Mr. Gandhi felt that the SafeHip product is not comparable to or competitive with the Posey and HipSaver products, and therefore, he did not include it in the comparisons discussed in the White Paper. On the other hand, according to Dr. Gupta and Mr. Gandhi, the Fall Guard product was included in the White Paper because it is a hybrid, that is, it has both a hard plastic shell and a foam pad.

22. I understand that Mr. Goodwin and The HipSaver Company have accused Posey and Mr. Gandhi of manipulating or falsifying data from Mr. Gandhi's experiments. Those accusations are absolutely incorrect. It was always the intention of myself and everyone at Posey that the testing performed by Mr. Gandhi would be appropriate, accurate, and reliable. I also understand that the methodology employed by Mr. Gandhi has been criticized. Neither I nor anyone at Posey had anything to do with the methodology employed by Mr. Gandhi.

23. Dr. Gupta also said that he had been contacted several times by Edward Goodwin from HipSaver. Among other things, Dr. Gupta explained that Mr. Goodwin wanted to know whether the foam pads from the products were tested in their pouches or not. Dr. Gupta explained that he first told Mr. Goodwin that the pads were tested outside the pouches. Later, however, Dr. Gupta learned from discussing the matter with Mr. Gandhi that indeed Mr. Gandhi had also tested the pads inside the pouches. Dr. Gupta said he telephoned Mr. Goodwin and left a voice message for Mr. Goodwin stating that the pads had also been tested inside the pouches and that the Posey product performed better than the HipSaver product when tested inside the pouches. Dr. Gupta said that Mr. Goodwin did not return the call.

24. I understand that Mr. Goodwin and The HipSaver Company accused Mr. Gandhi of falsely claiming to have included two HipSaver protectors in his testing. Mr. Gandhi told me that he had received email correspondence from Mr. Goodwin, dated January 22, 2004, from Mr. Goodwin to Mr. Gandhi that states:

    "we have a model called the SlimFit HipSaver. Is the product listed as Slimsaver a SlimFit or is it the product of another manufacturer other than HipSaver?"

    Mr. Gandhi's reply email to Mr. Goodwin dated January 26, 2004 states:

    "Yes, the product listed as Slimsaver is the Hipsaver Slimfit model."

    Attached hereto as Exhibit A is a true and correct copy of that email correspondence.

25. On June 18, 2004, at the direction of Ernest Posey, I instructed all independent sales representatives of Posey Hipsters to discontinue use of the White Paper, and to discontinue use of advertising or promotional materials that refer to information contained in the White Paper pending further investigation.

26. HipSaver's website, www.hipsaver.com, contains several comparative advertisements directed at Posey, which are false. For example, HipSaver's website states:

    a. "*Only HipSaver can be laundered according to the CDC (Center for Disease Control) Guidelines for laundry.*" But Posey's Hipster can also be laundered according to the CDC Guidelines for laundry.

    b. "*Posey®Hipsters wash care instructions: Up to a maximum of 160°F (CDC guideline suggested minimum).*" This statement is incorrect.

7

Posey's wash care instructions for the Hipster state: "Posey Hipsters may be washed according to CDC standards" with wash symbols noting the same.

27. The table listed in HipSaver's website also inaccurately represents that Posey does not have adaptive models to meet varied patients' needs. Posey's Hipster is available to customers in a variety of models, including the Standard Brief to be worn as unisex underwear, E-Z-ON Model ideal for showering or over an undergarment, Incontinent Brief for use over adult diapers, and Male Fly Brief for simplification of male toileting.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 29th day of July, 2004 at Arcadia, California.

*John Ross Frymark*