# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 04-11294-PBS

THE HIPSAVER COMPANY, INC.,    )
)
     Plaintiff,    )
)
  v.    )
)
J.T. POSEY COMPANY,    )
)
     Defendant.    )
)
_____ )
)
J.T. POSEY COMPANY,    )
)
     Counterclaimant,    )
)
  v.    )
)
THE HIPSAVER COMPANY, INC.,    )
)
     Counterdefendant.    )
)
)

## DEFENDANT'S OPPOSITION TO MOTION FOR
## PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

I.   INTRODUCTION........................................................................................1

II.  STATEMENT OF FACTS........................................................................1

     A. HIP PROTECTORS..............................................................................1

     B. MR. GANDHI'S EXPERIMENTS......................................................2

     C. THE WHITE PAPER............................................................................4

     D. THE WHITE PAPER HAS NOT HAD AN
        APPRECIABLE EFFECT ON SALES................................................5

III. ARGUMENT..............................................................................................7

     A. HIPSAVER WILL NOT PREVAIL ON ITS
        FALSE ADVERTISING CLAIMS.....................................................8

          1.   HipSaver Has Not Shown That Mr. Gandhi's
               Conclusions Are False...............................................................8

          2.   At Most, HipSaver and Professor Haves Have
               Criticized the Methodology Employed By
               Mr. Gandhi, Which is Insufficient for an Injunction.............11

          3.   HipSaver is Not Entitled to An Injunction Because
               HipSaver Has Not Shown That It Was Actually Injured...........15

          4.   No Injunction is Warranted Because Posey has
               Discontinued Use of the White Paper and the
               Requested Mandatory Injunction is Extreme..........................16

     B. THE HARM TO POSEY BY THE REQUESTED INJUNCTION
        OUTWEIGHS THE HARM TO HIPSAVER IF THERE IS NO
        INJUNCTION....................................................................................17

     C. THERE IS NO IRREPARABLE HARM............................................18

     D. A SUBSTANTIAL BOND SHOULD BE REQUIRED
        IF AN INJUNCTION IS ISSUED......................................................19

IV.  CONCLUSION..........................................................................................19

Defendant J.T. Posey Company ("Posey") submits the within opposition to Plaintiff's motion for preliminary injunction.

## I.    **INTRODUCTION**

This lawsuit has been brought by The HipSaver Company, Inc. ("HipSaver") to challenge the conclusions reached by Bimal P. Gandhi ("Mr. Gandhi"), who tested various hip protector products for his master's thesis ("Thesis"). Mr. Gandhi concluded that Posey's hip protector outperformed all competitors tested. Mr. Gandhi authored a "White Paper" that summarized his research and conclusions. Posey distributed the White Paper to customers and quoted some of the conclusions in its product catalogs.

HipSaver, which fashions itself as Posey's principal competitor for hip protectors, disagrees with Mr. Gandhi's methodology and conclusions. Not content to disagree with the results, HipSaver characterizes Mr. Gandhi's work as fraud, making unsupported accusations against Mr. Gandhi and Posey. But HipSaver has utterly failed to carry its burden to show that:

(1)    Mr. Gandhi's conclusions are incorrect; and

(2)    HipSaver suffered any actual harm as a result of Posey's advertising.

Accordingly, HipSaver's motion for preliminary injunction should be denied.

## II.    **STATEMENT OF FACTS**

### A.    **HIP PROTECTORS**

Body protectors have been used for years in sports, and patents pertaining to foam padding for injury prevention, e.g., U.S. Patent Nos. 5,557,802 and 5,881,395, date prior to the development of hip protectors. Body protectors typically incorporate (1) a thin preformed hard shell within a softer layered material that creates a shunting effect, (2) an

1

oval pad of soft, dense foam that absorbs energy, or (3) a combination of a hard shell and soft foam with shunting and energy absorption.[1]

Like Posey and HipSaver, numerous companies have developed and marketed hip protectors to be worn by the elderly to help protect against hip fractures in the event of a fall, including HIProtector, HIPS, KPH, HipGuard, SafeHip, and CuraMedica.[2]  Posey introduced its original hip protector, the "Hipster," in 1999 and introduced its redesigned model of the Hipster in 2001.[3]

### B.    MR. GANDHI'S EXPERIMENTS

In the Spring of 2002, Mr. Gandhi approached Posey with an idea for his Thesis.[4] He wanted to conduct experiments to test the effectiveness of various hip protectors.[5] Mr. Gandhi had been referred to Posey by an individual at the Veteran's Administration in West Los Angeles.[6]

After communicating with Mr. Gandhi and his supervising professor, Dr. Vijay Gupta ("Dr. Gupta"), Chairman of the Biomedical Engineering Department at University of California at Los Angeles ("UCLA"), Posey agreed to provide product samples to Mr.

---

[1]  *See* Exhibit 6 (White Paper) at page 6, attached to Plaintiff HipSaver's Motion For A Preliminary Injunction ("HipSaver's Motion").

[2]  *See* http://www.hiprotector.com/hips/bysku.html.

[3]  *See* Declaration of Victoria Gay Lewis ("Lewis Decl.") at ¶¶ 4-6 and Declaration of Ernest M. Posey ("Posey Decl.") at ¶ 6.

[4]  *See* Lewis Decl. at ¶ 14 and Declaration of John Ross Frymark ("Frymark Decl.") at ¶ 4.

[5]  *See* Lewis Decl. at ¶ 15 and Frymark Decl. at ¶ 4.

[6]  *See* Lewis Decl. at ¶¶ 14 and 15.

Gandhi and to make a gift to UCLA to support the research.[7]  However, Posey did not pay any money to Mr. Gandhi nor "retain" Mr. Gandhi.[8]

Mr. Gandhi began his research in the Spring of 2002 and concluded his experiments in the Fall of 2003.[9]  Mr. Gandhi tested five products:[10]

(1)    Posey Hipster (soft foam);

(2)    HipSaver, Nursing Home model (soft foam);

(3)    HipSaver SlimFit (soft foam); [11]

(4)    SafeHip (hard shell); and

(5)    Fall Guard (hybrid of hard shell and soft foam).

HipSaver and Posey's hip protectors, both containing soft pads, enclose the soft pad within a plastic pouch that is inserted in the lining of the garment.[12]  Mr. Gandhi initially tested the hip protectors with the foam pads removed from their plastic pouches.[13]

When Mr. Gandhi and Dr. Gupta preliminarily reported the results to Posey on February 19, 2003, Posey requested that the foam pads also be tested inside the

---

[7]  *See* Lewis Decl. at ¶ 16 and Frymark Decl. at ¶¶ 4-7.

[8]  *See* Frymark Decl. at ¶ 8.

[9]  *See* Frymark Decl. at ¶¶ 3, 5, 6 and 16 and Lewis Decl. at ¶¶ 14, 16, 22, 25, and 27.

[10]  *See* Lewis Decl. at ¶¶ 17-20 and Frymark Decl. at ¶ 10.

[11]  The SlimFit was mistakenly referred to as the "Slimsaver." *See* Lewis Decl. at ¶¶ 18-21 and Frymark Decl. at ¶ 10.  HipSaver has known since January that the reference to Slimsaver was a misnomer. *See* Lewis Decl., Exhibit A, at ¶ 32 and Frymark Decl. at ¶ 24.  Mr. Goodwin, HipSaver's President, learned this through email correspondence with Mr. Gandhi. *See id.*

[12]  *See* Lewis Decl. at ¶¶ 20-22 and Exhibits 1 and 2, attached to HipSaver's Motion.

[13]  *See* Lewis Decl. at ¶¶ 22-23 and Frymark Decl. at ¶¶ 11-12.

pouches.[14] Dr. Gupta expressed his belief that the results should not be affected, but nevertheless he agreed to test the Hipster and HipSaver products inside their pouches.[15] Additional product samples were provided to Mr. Gandhi for the purpose of testing inside the pouches, and Mr. Gandhi tested the Hipster and HipSaver pads inside their pouches.[16] Dr. Gupta has since reported to Posey that the results of testing the pads both inside the pouches and outside the pouches are consistent, i.e., the Posey Hipster outperformed the HipSaver products with and without the pouch.[17]

### C.    THE WHITE PAPER

In 2003, Mr. Gandhi authored the White Paper summarizing his results, and provided it to Posey in October 2003.[18] Posey never made any substantive changes to the White Paper, aside from formatting and grammatical changes.[19] Posey began distributing the White Paper and catalogs incorporating the conclusions of the White Paper in November 2003.[20]

---

[14] *See* Lewis Decl. at ¶¶ 22-23; Frymark Decl. at ¶¶ 11-12; and Posey Decl. at ¶ 7.

[15] *See* Lewis Decl. at ¶¶ 22-23 and Frymark Decl. at ¶¶ 11-12 and 17.

[16] *See* Lewis Decl. at ¶¶ 25, 28 and 30; Frymark Decl. at ¶¶ 12, 15, 17, 19 and 23; and Posey Decl. at ¶ 7.

[17] *See* Lewis Decl. at ¶¶ 22, 28 and 30 and Frymark Decl. at ¶¶ 11, 17, 19 and 23.

[18] *See* Lewis Decl. at ¶¶ 24 and 27 and Frymark Decl. at ¶¶ 13 and 16.

[19] *See* Lewis Decl. at ¶¶ 26, 27, and 29 and Frymark Decl. at ¶¶ 14 and18.

[20] *See* Posey Decl. at ¶ 8.

This suit was filed on June 10, 2004. Promptly thereafter, on June 18, 2004, Posey discontinued use of the White Paper and advertising or promotional materials that refer to information in the White Paper.[21]

Posey has at all times believed that Mr. Gandhi's research was appropriately conducted, his conclusions were properly drawn from his experiments, and that Mr. Gandhi's work was supervised and approved by Professor Gupta.[22] Nevertheless, Posey has halted the distribution of the White Paper and catalogs pending further investigation of the criticisms raised by HipSaver.[23] Until Mr. Gandhi's conclusions are either verified or disproved, Posey will not disseminate the White Paper or any materials containing information derived therefrom.[24]

### D.    THE WHITE PAPER HAS NOT HAD AN APPRECIABLE EFFECT ON SALES

HipSaver complains that its sales have been adversely affected, but no evidence is provided supporting this claim.[25] Edward L. Goodwin, HipSaver's President, ("Mr. Goodwin") complains that one significant customer switched from HipSaver to Posey.[26] Although Posey requested HipSaver to identify the customer involved, HipSaver refused to do so.[27] Nonetheless, Posey has identified one significant customer that switched from

---

[21] *See* Posey Decl. at ¶ 8 and Frymark Decl. at ¶ 25.

[22] *See* Lewis Decl. at ¶¶ 27, 30 and 31; Frymark Decl. at ¶¶ 16, 19 and 22; Posey Decl. at ¶ 7.

[23] *See* Posey Decl. at ¶ 8 and Frymark Decl. at ¶ 25.

[24] *See id.*

[25] *See* Tab A, Affidavit of Edward L. Goodwin ("Goodwin Affidavit") at ¶ 25, attached to HipSaver's Motion.

[26] *See id.*

[27] *See* Posey Decl. at ¶ 19.

HipSaver to Posey, and Posey believes this is the customer Goodwin complained about.[28] This customer selected Posey Hipster over the HipSaver because of *price*, not because of any promotional materials or product comparison claims.[29] Indeed, the White Paper was never sent to that customer, and the customer affirms that he did not even consider any promotional materials in making this decision.[30]

Although HipSaver has not provided any specific information demonstrating an adverse effect on HipSaver's sales, Posey has analyzed its Hipster sales since January 2002 to determine if the introduction of the White Paper in November 2003 affected Posey's sales.[31] Analyzing Hipster's sales data shows that there has been no appreciable effect on Posey's sales as a result of the White Paper.[32] Sales since the White Paper was introduced in November 2003 are consistent with the sales trends for the Posey Hipster since January 2002, and in fact, December 2003 sales were lower than December 2002 sales.[33]

There are several reasons why sales of Posey Hipsters continue to increase, including:[34]

(1)       The Posey Hipster is less expensive than the HipSaver;

---

[28]  *See* Posey Decl. at ¶¶ 19-20.

[29]  *See* Posey Decl. at ¶¶ 20-21 and Declaration of Martin Ryan ("Ryan Decl.") at ¶¶ 2-4.

[30]  *See* Posey Decl. at ¶ 21 and Ryan Decl. at ¶¶ 2-4.

[31]  *See* Posey Decl. at ¶ 10 and Declaration of Alan Goedde at ¶¶ 2-8.

[32]  *See* Posey Decl. at ¶¶ 10 and 23 and Goedde Decl. at ¶¶ 5-8.

[33]  *See* Posey Decl. at ¶¶ 11-18.

[34]  *See* Posey Decl. at ¶¶ 21 and 22.

(2)     The demand for these products is increasing due to the continued aging of the population as a whole;

(3)     Posey has an excellent reputation for its healthcare products;

(4)     Posey offers more than 600 products, and many customers prefer the convenience of purchasing many different products from one source; and

(5)     Posey has an established network of dealers and distributors.

HipSaver's own expert, Wilson C. Hayes, Ph.D. ("Professor Hayes"), confirms that the demand for these products is on the rise: "the current and future markets, both domestically and internationally, for effective and acceptable trochanteric padding systems is obviously already enormous and can only be expected to grow dramatically in the future."[35]  Thus, there is no reason to conclude that the introduction of the White Paper or any related promotional material has had any material effect on the relative sales of the Posey Hipster and the HipSaver.  The failure of HipSaver to provide any evidence about HipSaver's sales suggests that its sales have not declined, and that HipSaver in fact has suffered no adverse effect from the distribution by Posey of these materials.

## III.   ARGUMENT

There are four factors for district courts to consider in determining whether to grant a preliminary injunction: "(1) the movant's probability of success on the merits, (2) the likelihood of irreparable harm absent preliminary injunctive relief, (3) a comparison between the harm to the movant if no injunction issues and the harm to the objectors if one does issue, and (4) how the granting or denial of an injunction will interact with the public interest." *New Comm Wireless Servs., Inc. v. Sprintcom, Inc.*, 287 F.3d 1, 8-9 (1st

---

[35] *See* "Tab B", Preliminary Summary Letter of Wilson C. Hayes, Ph.D. ("Hayes Letter") at page 3, ¶ 10, attached to HipSaver's Motion.

Cir. 2002). HipSaver has failed to meet its burden by showing any of these factors weigh in its favor.

## A.    HIPSAVER WILL NOT PREVAIL ON ITS FALSE ADVERTISING CLAIMS

To prevail on the merits of its Lanham Act claim, HipSaver must prove a false statement of fact by the defendant in a commercial advertisement about its own or another's product, which HipSaver has failed to do. *Gillette Co. v. Norelco Consumer Products Co.*, 69 F. Supp. 2d 246, 258 (D. Mass. 1999).

### 1.    HipSaver Has Not Shown That Mr. Gandhi's Conclusions are False

The premise of HipSaver's lawsuit is that Mr. Gandhi's methodology is unreliable and flawed, and accordingly, the results must be wrong. However, HipSaver has failed to provide any evidence, such as its own testing of the hip protectors, to show that Mr. Gandhi's results are incorrect. This is particularly unusual in light of HipSaver's retained expert's ability to perform hip protector testing, as evidenced in articles authored by Professor Hayes.[36] Instead of providing its own test results,[37] HipSaver makes numerous unsupported, nearly hysterical allegations about Mr. Gandhi's methodology.

---

[36] *See, e.g.,* Robinovitch SN, Hayes WC, Wenz JT, McMahon TA. Available trochanteric padding systems fail to reduce femoral impact force below fracture threshold. Orthop Res Soc Trans, 1993. 18:560; Courtney AC, Watchel EF, Myers ER, and Hayes WC. Effects of loading rate on strength of proximal femur. Calcif Tissue Int, 1994. 55(1): p. 53-58; Robinovitch SN, Hayes WC, and McMahon TA. Force attenuation in trochanteric soft tissues during impact from a fall. J Orthop Res, 1995. 13(6): p. 499-508; and Robinovitch SN, Hayes WC, and McMahon TA. Energy-shunting hip padding system attenuates femoral impact force in a simulated fall. J Biomech Eng, 1995. 117(4): p. 409-13. (Some of these articles are cited in Hayes Letter attached to HipSaver's Motion).

[37] HipSaver has had more than adequate time to conduct is own testing. As early as February 18, 2003, Mr. Goodwin accused Posey of "knocking off" HipSaver's hip protectors, and also sent Posey a letter pertaining to Posey's advertising on March 18, 2004. *See* Exhibits A and B, attached to Declaration of William J. Brutocao ("Brutocao Decl.") at ¶¶ 3 and 4 in support of

First, HipSaver asserts Mr. Gandhi did not even test HipSaver products. Yet, HipSaver is well aware that two of its products were tested: the HipSaver nursing model and the HipSaver SlimFit, misnamed as the "Slimsaver" in the Thesis. An email message from Mr. Goodwin to Mr. Gandhi dated January 22, 2004, evidences Mr. Goodwin's knowledge that his product was tested by Mr. Gandhi: "we have a model called the SlimFit HipSaver. Is the product listed as Slimsaver a SlimFit or is it the product of another manufacturer other than HipSaver?" Mr. Gandhi's reply email to Goodwin dated January 26, 2004 states: "Yes, the product listed as Slimsaver is the Hipsaver Slimfit model."[38] Accordingly, there can be no genuine dispute about what products were tested.

Second, HipSaver accuses Posey of "retaining" Mr. Gandhi, in support of its argument that Mr. Gandhi's results were biased and fraudulent. However, it was Mr. Gandhi who approached Posey at the direction of an individual at the Veteran's Administration in West Los Angeles.[39] The idea for this research project was entirely Mr. Gandhi's, and Posey had no control over the research.[40] Posey made a single contribution to UCLA at the outset of the project, but never made any payments to Mr. Gandhi.[41] Moreover, Posey had absolutely no influence on the testing methodology

---

Posey's Motion for an Order Permitting Expedited Discovery filed June 9, 2004 ("Posey's Expedited Discovery Motion").

[38] *See* Lewis Decl., Exhibit A, at ¶¶ 18-21 and 32 and Frymark Decl. at ¶¶ 10 and 24.

[39] *See* Lewis Decl. at ¶¶ 14-15 and Frymark Decl. at ¶ 3.

[40] *See* Lewis Decl. at ¶¶ 15, 26, and 31 and Frymark Decl. at ¶¶ 3, 4, 9, 14, and 16.

[41] *See* Frymark Decl. at ¶¶ 7 and 8.

employed by Mr. Gandhi, the conclusions reached by Mr. Gandhi, and the information included in or excluded from the White Paper.[42]

Third, HipSaver attacks Posey for "knocking off" products, an irrelevant, yet again, unsubstantiated argument, that implies Posey butchers test results for a competitive advantage. On the contrary, Posey has invented several products in the health care industry and obtained several patents, including U.S. Patent Numbers 4,685,454; 5,076,288; 3,437,089; 3,216,917; and 2,851,033.[43]  Posey's developments of its hip protectors are a result of hard work and innovation based on customer demand and market research.[44]  Even Mr. Goodwin explicitly acknowledged that Posey's hip protector does not infringe his patent, U.S. Patent No. 6,519,780, entitled "Air-Holding Protective Foam Pad."[45]

HipSaver's unsupported, and even irrelevant, arguments in no way show that Mr. Gandhi's test results reported in the Thesis and White Paper are wrong. Indeed, HipSaver has wholly failed to adduce any evidence that the results are incorrect. The lack of such competing tests seriously undermines HipSaver's argument that the results of Mr. Gandhi's tests are "fatally flawed" or "literally false."

---

[42]  *See* Lewis Decl. at ¶¶ 26, 27, and 29 and Frymark Decl. at ¶¶ 14 and 18.

[43]  *See* Posey Decl. at ¶¶ 3 and 4.

[44]  *See* Posey Decl. at ¶¶ 5 and 6 and Lewis Decl. at ¶¶ 7 and 10-13.

[45]  *See* Exhibit B, attached to Brutocao Decl. at ¶ 4 in support of Posey's Expedited Discovery Motion.

**2.    At Most, HipSaver and Professor Hayes Have Criticized the Methodology Employed By Mr. Gandhi, Which is Insufficient for an Injunction**

As HipSaver has not shown that the conclusions in the White Paper are incorrect, it has decided to attack the test results as unreliable due to alleged errors in Mr. Gandhi's methodology and protocol. However, a plaintiff cannot meet its burden by merely exposing methodological weaknesses of a defendant's tests: "[T]he fact that the challenged tests are flawed, in and of itself, is insufficient to meet this burden. Rather, the plaintiff bears the burden of demonstrating that the flaws in the defendant's tests were sufficiently material as to render the defendant's reliance thereon objectively unreasonable." *S.C. Johnson & Son, Inc. v. Clorox Co.*, 930 F. Supp. 753, 930 (E.D.N.Y. 1996).[46]

HipSaver has not demonstrated that any flaws in Mr. Gandhi's tests were sufficiently material as to render Posey's reliance thereon unreasonable. HipSaver derives its attacks from an unauthenticated letter authored by Professor Hayes delineating

---

[46] *See also Spalding Sports Worldwide, Inc. v. Wilson Sporting Goods Co.*, 198 F. Supp. 2d 59, 67 (D. Mass. 2002) (where plaintiff argued that defendant's test for comparing golf balls was literally false because it failed to test for actual playing conditions by not including certain factors such as testing for balance, court held defendant's advertising claims did not resemble an extreme divorce from actual use conditions and "the fact that 'balance' is only one among many factors that affects putting does not mean that [defendant] is prohibited by law from isolating the effects of balance on putting in a test, and advertising the results"); *L & F Products v. Procter & Gamble Co.*, 845 F. Supp. 984, 1001 (S.D.N.Y. 1994), *aff'd*, 45 F.3d 709 (2nd Cir. 1995) (affirming district court's denial of a preliminary injunction notwithstanding the finding that Procter & Gamble's tests "were far from perfect and are subject to various infirmities"); *American Home Products Corp. v. Procter & Gamble Co.*, 871 F. Supp. 739 (D.N.J. 1994) (where defendant advertised its pain medication as superior to plaintiff's medication, and studies did not show that defendant's medication had a duration of action superior to plaintiff's medication, nor did studies show a statistically significant difference, court still refused to find defendant's advertisements literally false); *Abbot Laboratories v. Gerber Products Company, Inc.*, 979 F. Supp. 569 (W.D. Mich. 1997) (court held defendant's testing not unreliable, and thus, advertisements not literally false where plaintiff argued that test improperly included participants who did not use products).

three "fundamental flaws,"[47] despite the fact that Mr. Gandhi's methodology was reviewed and approved by Dr. Gupta, Professor J. Michael Kabo (now Assistant Dean at California State University, Northridge), and Professor Ajit Mal.[48]

First, the supposedly "fatal" and "fundamental" flaw identified by Professor Hayes is the size of the impact hammer selected by Mr. Gandhi. Mr. Gandhi used an impact hammer of about three inches in diameter, which he selected after reviewing the relevant literature that reveals this area is the size of the typical impact area when a person falls the hip.[49] Selecting a three-inch impact hammer is not a "fundamental flaw." The range of values for the cross-sectional area in the literature varies greatly, ranging from 3.8 centimeters, Robinovitch et al. (1995), to 13 centimeters, Kannus (1999).[50]

Moreover, Professor Thomas Hedman, an Associate Professor of Research at the Department of Biomedical Engineering at the University of Southern California, has reviewed the Thesis and disagrees with Professor Hayes:[51]

> Having reviewed the thesis, I would conclude that this study design constitutes a reasonable methodology for impact testing of hip protector foam inserts in a pseudo-physiologic environment.

---

[47] Professor Hayes designates any remaining "flaws" as insignificant or secondary. *See* Hayes Letter, Tab B, at pages 5 and 6, attached to HipSaver's Motion.

[48] *See* Declaration of Shannon S. Sheldon, Exhibit C, at ¶ 2, filed herewith.

[49] *See id.*

[50] *See* Robinovitch SN, Hayes WC, and McMahon TA. Energy-shunting hip padding system attenuates femoral impact force in a simulated fall. J Biomech Eng, 1995. 117(4): p. 409-13; Kannus P, Parkkari J, and Poutala J. Comparison of Force Attenuation Properties of Four Different Hip Protectors Under Simulated Falling conditions in the Elderly: An In Vitro Biomechanical Study. Bone, 1999. (2): p. 229-235; and Lauritzen JB, Petersen MM, Lund B. External hip protectors against hip fractures. A randomized study in a nursing home. Ugeskr Laeger, 1993. 155(2): p. 1523-6 (using 4.5 cm).

[51] *See* Declaration of Thomas Paul Hedman, Ph.D. at ¶¶ 6 and 10, filed herewith.

* * *

Hayes describes Kannus' "peer-reviewed" impact device as having 3 times the cross-sectional area, meaning 5 inches in diameter…instead of Gandhi's "fatally flawed" 3 inches.  To me, it seems these dimensions are far too close to each other to deem only one of them "fatally flawed," and making only one of these studies "completely unrepresentative of a fall on the hip."

The second "major deviation from accepted scientific practices" is Mr. Gandhi's alleged testing of the products without the plastic pouch.[52]  HipSaver incorrectly asserts that Mr. Gandhi did not test the foam pads inside their pouches.  Indeed, Posey insisted that the products be tested inside the pouches, and Mr. Gandhi conducted such tests in 2003.[53]  The results reported to Posey by Mr. Gandhi and Dr. Gupta have always been consistent, i.e., the Posey Hipster outperformed the HipSaver when tested inside the pouch or outside the pouch.[54]  The flaw is HipSaver's false assumption that the products were tested only outside the pouches, not Mr. Gandhi's experiments.

The third and last "fundamental flaw" asserted by Professor Hayes is Mr. Gandhi's exclusion of products such as the shunting (hard shell) hip protectors.  HipSaver complains that the White Paper does not mention the results of Mr. Gandhi's tests of the SafeHip product, which according to HipSaver, had better results than Posey or HipSaver in Mr. Gandhi's tests.  Entirely Mr. Gandhi's decision, the SafeHip results were excluded from the White Paper because the SafeHip contains a hard plastic shell,

---

[52] *See* Hayes Letter, Tab B, at page 7, ¶ 15, attached to HipSaver's Motion.

[53] *See* Lewis Decl. at ¶¶ 22, 23, 25, and 28; Frymark Decl. at ¶¶ 11, 12, 15, 17, 19, and 23; and Posey Decl. at ¶ 7.

[54] *See* Frymark Decl. at ¶ 7.

and not a soft foam pad, as explained at page 8 of the White Paper.[55]  Likewise, Mr.

Gandhi omitted SafeHip from his compression analysis in this Thesis due to its irregular

shape.[56]  The exclusion of this entirely different device is appropriate: the diverse effects

of a hard shell compared to a soft foam are well documented in articles cited by

HipSaver's own expert.[57]

        As acknowledged in nearly all literature, including that of Professor Hayes, there

is a range of testing methodologies used for testing hip protectors:  "studies were

performed at different energy levels and used different experimental protocols, thereby

complicating comparisons between padding systems."[58]  Yet, the different methodologies

in each study do not render each of these studies flawed and unreliable.  Accordingly, Mr.

---

[55]  *See* Exhibit 6 (White Paper), attached to HipSaver's Motion.

[56]  *See* Exhibit 7 (Thesis) at page 52, attached to HipSaver's Motion.

[57]  *See e.g.,* Robinovitch SN, Hayes WC, and McMahon TA. Energy-shunting hip padding system attenuates femoral impact force in a simulated fall. J Biomech Eng, 1995. 117(4): p. 409-13 (concluded greatest reduction in peak femoral impact force was provided by an energy-shunting pad and this property was better than the force reduction provided by the best energy-absorbing pad in part due to the "U" shaped pad of the shunting pad forming a bridge over the bone, as opposed to a soft pad which directly overlies the greater trochanter); *see also* Kannus P, Parkkari J, and Poutala J. Comparison of Force Attenuation Properties of Four Different Hip Protectors Under Simulated Falling conditions in the Elderly: An In Vitro Biomechanical Study. Bone, 1999. (2): p. 229-235 (concluding the very good testing results of the shunting protectors can be understood by their firm and adequately convex structure, and the energy shunting protectors may influence the risk of other fractures).

[58]  Robinovitch SN, Hayes WC, and McMahon TA. Energy-shunting hip padding system attenuates femoral impact force in a simulated fall. J Biomech Eng, 1995. 117(4): p. 409-13.  The authors of the relevant literature criticize their own work, for example, Courtney et al. (1994) admits "our study also had a number of limitations...the test configurations imulated only one type of fall..."  Courtney AC, Watchel EF, Myers ER, and Hayes WC. Effects of loading rate on strength of proximal femur. Calcif Tissue Int, 1994. 55(1): p. 53-58.  And Pakkari et. al (1994) acknowledges "our study had a number of limitations...of course, our study would be more complete if we had included a wider range of materials...".  Parkkari J, Kannus P, Poutala J, Vuori I. Force attenuation properties of various tronchanteric padding materials under typical falling conditions of the elderly. J Bone Miner Res, 1994. 9(9): p. 1391.

Gandhi's experimentation is not "fatally flawed" simply because the protocol differs from previous experiments.

### 3.     HipSaver is Not Entitled to An Injunction Because HipSaver Has Not Shown That It Was Actually Injured

In addition to proving there is a false advertisement, which HipSaver has failed to do, HipSaver must also show it has been or is likely to be injured as a result of the false statement. *Gillette Co. v. Norelco Consumer Products Co.*, 69 F. Supp. 2d 246, 258 (D. Mass. 1999). Thus, HipSaver must demonstrate that the false advertisement actually harmed its business. "The likelihood of injury is not presumed, but must be demonstrated." *Hill's Pet Nutrition, Inc. v. Nutro Products, Inc.*, 258 F. Supp. 2d 1197, 1211-1212 (D. Kan 2003) (plaintiff presented consumer survey showing 37% deception rate, but court held "[p]laintiff, having made no attempt to translate the survey's deception rate into purchasing decisions or loss of sales, fails to meet this element [of causation]").

HipSaver has not produced any evidence of loss of sales after introduction of Posey's advertising, or even that its sales have declined.[59] HipSaver has pointed to only one customer (whom HipSaver has not identified) that it claims to have lost, but does not allege that it has lost this customer due to Posey's advertising.[60] This customer did not switch from HipSaver to Posey because of any advertising claims, but rather, because Posey's hip protectors are less expensive.[61] Furthermore, the customer independently

---

[59] *See* Goodwin Affidavit, Tab A, at ¶ 25, attached to HipSaver's Motion.

[60] *See id.*

[61] *See* Posey Decl. at ¶¶ 20-21 and Ryan Decl. at ¶¶ 2-4.

evaluated the Posey product before switching. [62] For this reason alone, the preliminary injunction should be denied.

###### 4.    No Injunction is Warranted Because Posey has Discontinued Use of the White Paper and the Requested Mandatory Injunction is Extreme

HipSaver's motion for prohibitory injunctive relief is moot, and thus should be denied, because Posey has ceased distributing the White Paper and all references to the conclusions of the White Paper from its advertisements on or about June 18, 2004.[63]  *See Brown v. Armstrong*, 957 F. Supp. 1293, 1303, fn. 8 (D. Mass. 1997) (plaintiffs' claim for injunctive relief was moot to the extent it was based on the infomercial, because the infomercial stopped running, and there were no plans to air it in the future); *CCBN.com, Inc. v. c-call.com, Inc.*, 73 F. Supp. 2d 106 (D. Mass. 1999) (request for injunctive relief was moot where defendant removed its statement on its web page that it is the "first and only Internet-based information exchange for the financial community").

Furthermore, HipSaver's demands for a mandatory injunction requiring immediate corrective advertising are extreme and unwarranted.  "Mandatory preliminary injunctions do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief." *Massachusetts Coalition of Citizens v. Civil Defense Agency*, 649 F.2d 71, 76 n. 7 (1st Cir. 1981); *see also* 11 C. Wright & A. Miller, Federal Practice & Procedure: Civil § 2942, at 377 (1973 & Supp. 1989) (noting that courts may be more reluctant to grant mandatory injunctions than prohibitory ones).

---

[62]  *See* Posey Decl. at ¶ 21 and Ryan Decl. at ¶¶ 2-4.

[63]  *See* Posey Decl. at ¶ 8 and Frymark Decl. at ¶ 25.

Courts have a long-standing history in refusing to issue mandatory injunctions requiring corrective advertising, particularly where the plaintiff produces no evidence in support of its injuries. *See Bristol Technology, Inc. v. Microsoft Corp.*, 114 F. Supp. 2d 59, 98 (D. Conn. 2000) (refusing corrective advertising where such injunctive relief would be unnecessarily broad and the deceptive practice can be remedied by more narrowly tailored relief); *Zeneca Inc. v. Eli Lilly & Co.*, No. 99 CIV. 1452, 1999 WL 509471, at *42 (S.D.N.Y. July 19, 1999) (refusing to require corrective advertising but instead requiring sales representatives who disseminated false advertising to complete a training program); *Metro Mobile CTS, Inc. v. Newvector Communications*, 643 F.Supp. 1289, 1296 (D. Ariz.1986) (refusing to grant mandatory injunction requiring corrective advertising)*; Toro Co. v. Textron, Inc.*, 499 F. Supp. 241, 254 (D.C. Del. 1980) (holding plaintiff is not entitled to a mandatory injunction requiring defendant to correct its past misrepresentations in future advertising where plaintiff failed to show that it actually was injured by those claims); *Ames Pub. Co. v. Walker-Davis Publications*, Inc., 372 F.Supp. 1, 12 (E.D. Pa. 1974). As HipSaver has presented no evidence of its injuries, the extraordinary remedy of corrective advertising is inappropriate and unnecessary.

### B.    THE HARM TO POSEY BY THE REQUESTED INJUNCTION OUTWEIGHS THE HARM TO HIPSAVER IF THERE IS NO INJUNCTION

HipSaver also failed to show that the threatened injury to it outweighs whatever damage the temporary relief may cause Posey. *New Comm Wireless, supra*, 287 F.3d at 8-9. It is Posey who would incur significant expenses in issuing corrective advertising. HipSaver seeks an order requiring Posey to mail corrections to at least 50,000 customers, which obviously would be very expensive. Moreover, if Posey were required to issue

statements to all customers that its advertisements were false, yet subsequent testing showed that its advertisements are in fact true, then the harm to Posey's reputation and goodwill would be unimaginable. *See Hill's Pet Nutrition, supra,* 258 F. Supp. 2d at 1207 (where plaintiff wanted corrective advertising and for defendant to monitor the recall of previously distributed packages and advertising materials, and defendant countered that corrective advertising would be costly and burdensome, court held plaintiff did not meet "its burden to show that the threatened injury to it outweighs whatever damage the temporary relief may cause the defendant"); *Abbot Laboratories v. Gerber Products Company, Inc.,* 979 F. Supp. 569 (W.D. Mich. 1997) (balance weighs in defendant's favor where costs to defendant would be substantial if defendant were required to cease its advertising campaign or recall or relabel products).

### C.    THERE IS NO IRREPARABLE HARM

There is no likelihood of irreparable harm, an essential element for a preliminary injunction. *New Comm Wireless, supra,* 287 F.3d at 8-9. As detailed above, HipSaver has adduced no evidence that HipSaver has suffered any harm at all.[64]

In short, even if the Court were to credit the criticisms of Mr. Gandhi's research, the Court should not order the requested corrective advertising for several reasons:

(1)    Posey has discontinued the White Paper and related materials;

(2)    HipSaver has produced no evidence that HipSaver has in fact suffered any injury as a result of Posey's advertising;

(3)    The harm to Posey would substantially outweigh any benefit to HipSaver; and

(4)    It would be unduly costly and burdensome to Posey .

---

[64] *See* Posey Decl. at ¶ 24.

### D.     A SUBSTANTIAL BOND SHOULD BE REQUIRED IF AN INJUNCTION IS ISSUED

No preliminary injunction can issue under Rule 65 without a sufficient bond. An appropriate bond in the event that the Court issues the requested injunction should be sufficient to compensate Posey for harm that Posey will suffer from an injunction that ought not have been issued. Given the serious adverse effect on Posey's reputation (that will impact Posey's sales on all its products, not just hip protectors), a very substantial bond is necessary. Posey submits that a bond should be not less than $500,000.00.

### IV.     CONCLUSION

For the foregoing reasons, the preliminary injunction should be denied.

Dated: 5th day of August, 2004

J.T. POSEY COMPANY
By its attorneys,


_____ /s/ Anthony J. Fitzpatrick _____
Anthony J. Fitzpatrick (BBO # 564324)
DUANE MORRIS LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210
(617) 289-9200

Jeffrey G. Sheldon (CA Bar No. 67516)
William J. Brutocao (CA Bar No. 75959)
SHELDON & MAK
225 South Lake Avenue, Suite 900
Pasadena, CA 91001
(626) 796-4000

BOS\107707.1

19